IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PATRICK LEWIS HUBBARD                                           PLAINTIFF

v.                          Civil No.  5:16-cv-05319

SGT. WALTON; DEPUTY JAMES                                       DEFENDANTS
STOUT; CORPORAL KEVIN
BAUGHMAN; DETECTIVE
BRET HAGAN; and SERGEANT
MICHAEL FREEMAN

## OPINION AND ORDER

Plaintiff, Patrick Lewis Hubbard, filed this action pursuant to 42 U.S.C. §1983.  He

proceeds *pro* se and *in forma pauperis.*  Plaintiff is currently incarcerated in the Grimes Unit of

the Arkansas Department of Correction.  The events at issue in this case occurred while Plaintiff

was detained in the Washington County Detention Center (WCDC).

The case is before the Court on the Motion for Summary Judgment (ECF No. 45) filed by

the Defendants.  Plaintiff has responded (ECF No. 51) to the Motion.

Plaintiff maintains that while he was incarcerated at the WCDC that his constitutional

rights were violated in the following ways:  Deputy Stout and Corporal Baughman used excessive

force against him on August 18, 2015; he was subjected to cruel and unusual punishment when

Sergeant Freeman ordered that he be waist chained and shackled whenever he left the cell

including in the shower which resulted in Plaintiff slipping and falling; Sergeant Walton exhibited

deliberate indifference to Plaintiff's safety when she watched the August 18, 2015, use of

excessive force against him and did not intercede on his behalf; and Detective Hagan deprived him

of substantive due process and invaded Plaintiff's privacy when he forced the Plaintiff to undergo

1

testing for Hepatitis C and human immunodeficiency virus (HIV).  Plaintiff has sued each Defendant in his/her personal capacity only.  (ECF No. 31).

## I. BACKGROUND

Plaintiff was arrested on August 17, 2015, by the Fayetteville Police Department for 1st degree terroristic threatening and 2nd degree stalking.  (ECF No. 48-2 at 1).  The allegations behind the criminal charges were that he had been threatening Brandi Copeland, an employee of the WCDC.  (ECF No. 48-11 at 6).  Plaintiff indicated in his deposition that he had been dating her on and off for about two weeks.  (ECF No. 48-11 at 6).  However, when he was interviewed by Detective Hagan, Plaintiff indicated he had been seeing Copeland on and off for two months.  *See also* (ECF No. 48-2 at 12) (statement of Brandi Copeland that they had been seeing each other on and off for about four months).

Plaintiff is Black.  (ECF No. 48-2 at 3).  When booked on August 18, 2015, it was noted that he was 6'3" tall and weighed 280 pounds.  *Id.* at 2.

Following his arrest, Plaintiff was taken to the WCDC just prior to midnight.  (ECF No. 48-2 at 1).  In the early morning hours of August 18, 2015, during the booking process, Plaintiff was taken to the Automated Fingerprint Identification System (AFIS) room for fingerprinting, to have booking pictures taken, and to document his tattoos.  *Id.*

**Defendants' Version of the Events In the AFIS Room**

Defendants state that Plaintiff was verbally aggressive and "very slow and resistive turning to face the appropriate directions."  (ECF No. 48-5 at 3).  When told to face the grey wall so a picture could be taken of a tattoo on his neck, Plaintiff struck the wall hard enough to break the grey photograph backdrop and causing two of his knuckles to "bust open" and "splatter[] blood on the wall."  *Id.*

Deputies Stout and Harris attempted to restrain the Plaintiff but were struggling due to Plaintiff's "size" and "aggressiveness." (ECF No. 48-5 at 3). Corporal Baughman attempted to "assist by gaining control of Hubbard's head and guiding him to the floor." *Id.* When this did not work, Corporal Baughman drew his taser and deployed it striking Plaintiff in the right side just below his breast. *Id.* When this elicited only a mild reaction, Corporal Baughman concluded that "the probes had not made a good connection." *Id.* For this reason, Corporal Baughman "drive stunned [Plaintiff] in the right lower thigh area completing the arc." *Id.* The deputies were then able to force Plaintiff to the floor. *Id.*

When the five second drive stun cycle was over, Corporal Baughman reported that he instructed the Plaintiff to "stop resisting and place his hands behind his back or he would be tased again." (ECF No. 48-5 at 3). When Plaintiff continued to resist and refused to comply with instructions, Corporal Baughman again "deployed a five second drive stun." *Id.* When Plaintiff's behavior continued, Corporal Baughman warned him that he would be tased again. *Id.* When Plaintiff did not comply, Corporal Baughman "delivered another five second drive stun to [Plaintiff's] left lower back." *Id.* This time when Plaintiff was instructed to place his hands behind his back, he complied and handcuffs were placed on him. *Id.*; *see also* (ECF No. 48-5 at 11-12)(Corporal Baughman's incident report).

The nurse was called and came and removed the probes. (ECF No. 48-5 at 3). Plaintiff was placed in a restraint chair and put into a holding cell. *Id.* According to Corporal Baughman, Plaintiff then began saying he had AIDS. *Id.* Plaintiff also told Corporal Baughman and several other deputies that when they got home they had better make love to their wives and kiss their kids goodbye because they were going to die due to their behavior. *Id.* Plaintiff made multiple statements to the affect that harm would come to the deputies and their families. *Id.*

Sergeant Walton reported that her first contact with the Plaintiff occurred when she was called to the booking area due to the fact that he was "yelling and acting strange." (ECF No. 48-5 at 5). When she arrived, Plaintiff had already been placed in a holding cell by Corporal Baughman. *Id.*

Sergeant Walton instructed Deputy Stout and Corporal Baughman to take Plaintiff to the AFIS room for prints. (ECF No. 48-5 at 5). Sergeant Walton indicated she could hear the Plaintiff "ranting and screaming about being a gangster and what he could do to all of us." *Id.* Subsequently, Sergeant Walton heard a loud bang and looked into the room and saw the deputies trying to restrain the Plaintiff. *Id.* Sergeant Walton called for assistance and then entered the room. *Id.* Deputies responded and once she saw that the Plaintiff was secured, she called the deputies off one at a time. *Id.* Sergeant Walton indicates she then noticed the Plaintiff had been tased and she called the nurse. *Id.*

Plaintiff was strapped down in a restraint chair. While in the chair, Sergeant Walton reported that Plaintiff made threats against Deputy Stout and Corporal Baughman and their families. (ECF No. 48-5 at 5). Sergeant Walton indicated that Plaintiff stated that he had gang members and family who could take care of them all. *Id.* She also noted that Plaintiff stated he "went way back" with Deputy Stout and the next time he saw Deputy Stout that he would die. *Id.* According to Sergeant Walton, Plaintiff repeated this threat. *Id.* Sergeant Walton instructed Deputy Stout to have no further contact with the Plaintiff. *Id.*

Deputy Vickery, Deputy Stout, Deputy Tripodi, Deputy Hudgens, Deputy Sena, Corporal Rose, Deputy Ridenoure, Sergeant Muggy, Deputy Garcia, and Deputy Gardner, who all responded to the request for assistance, also submitted incident reports about Plaintiff's conduct and the threats that he made. (ECF No. 48-5 at 6-19, 21). Deputy Harris was also present during

the incident. *Id.* at 20. Plaintiff was placed in administrative segregation for fifteen days "due to his mental state and making threatening comments towards officers." *Id.* at 7. Instructions were issued providing that there had to be two deputies present any time they were dealing with the Plaintiff. *Id.*

### Plaintiff's Version of What Occurred in the AFIS Room

According to the Plaintiff, he punched the wall as they told him to turn around because he was upset about being arrested. (ECF No. 48-11 at 11). Plaintiff testified that Deputy Stout was "acting kind of tough" and was "saying some smart stuff out of the mouth." *Id.* at 33. In Plaintiff's opinion, Deputy Stout had a "foul attitude towards" him. *Id.*

Plaintiff indicated that when they all rushed him that he just stood there and made no attempt to hit anyone and was not struggling or resisting in anyway. (ECF No. 18-11 at 11 & 19). Plaintiff testified that the first time he was tased he just stood there. *Id.* The second time he was tased he started going to the ground. *Id.* Plaintiff testified that when he was on the floor, he was tased another time when he was face down on the ground, three people had his arms, and one deputy had a foot on his head. *Id.* Plaintiff indicated that right before Corporal Baughman tased him the fourth time, Corporal Baughman told him to stop resisting. *Id.* at 20. Plaintiff testified he screamed that they were trying to kill him. *Id.* He also told them that his arm had been broken and would not bend back like they wanted it to. *Id.* at 25.

Plaintiff testified it was Corporal Baughman who tased him "and continued to tase [him], even though [he] wasn't struggling or – anything." (ECF No. 48-11 at 19). Plaintiff denied that Corporal Baughman warned Plaintiff that he was going to be tased unless he complied with orders. *Id.*

Plaintiff testified that he was tased a total of four times. (ECF No. 48-11 at 11). Plaintiff was then handcuffed and restrained and Plaintiff testified Deputy Stout still had his knee on the left side of Plaintiff' head. (ECF No. 48-11 at 11). Plaintiff testified Deputy Stout "stood up and dropped back down on my head with his knee." *Id.* at 11-12 & 14. Plaintiff indicated that this action caused blood to come from his left ear. *Id.* at 14. Plaintiff was then stood up and placed in the restraint chair. *Id.* at 12. Plaintiff testified the entire incident happened in a matter of seconds. *Id.* at 22.

Plaintiff stated that the taser caused extreme pain but the pain only lasted seconds. (ECF No. 48-11 at 26). He suffered no other physical injuries other than where the prongs had been in his skin on his left side. *Id.* Plaintiff testified the taser peeled the skin away and "burn[ed] it in that area." *Id.* The only treatment he received from the nurse was that she removed the prongs. *Id.* Plaintiff did not ask for any medical treatment. *Id.* at 27. He did not receive any treatment for the injuries to his hand from where he struck the wall. *Id.* Plaintiff testified his hand was not bleeding very much. *Id.*

Plaintiff testified he did not complain about his ear bleeding. (ECF No. 48-11 at 14). In fact, Plaintiff testified he actually did not realize his ear was bleeding until after he was taken to isolation. *Id.* at 15. He stated that his ear was hurting so he rubbed it and felt the blood. *Id.* It was not a lot of blood and he did not ask for any treatment and did not report it on the kiosk. *Id.* at 16. His ear continued to ache from the knee drop for approximately four days. *Id.*

Plaintiff testified that with respect to Sergeant Walton, she just basically "sat" and "watched" without doing anything to intervene or "correct or discipline the officers for doing it." (ECF No. 48-11 at 29-30). Plaintiff also indicated that Sergeant Walton could not have heard him

ranting and raving in the AFIS room about a Gangster Disciple because he never said a word until after he was being tased. *Id.*

When Plaintiff was placed in the restraint chair, he stated that he and Deputy Stout knew each other. (ECF No. 48-11 at 17). Specifically, Plaintiff testified he said that "Deputy Stout and I go way back, and he's going to die when I see him." *Id.* Plaintiff, however, did not have any prior relationship with Deputy Stout. *Id.* at 16-17. Plaintiff testified he only said that to aggravate Deputy Stout. *Id.* at 17. *Id.*

Plaintiff admitted that he threatened to kill Deputy Stout's family and have sex with his wife while Deputy Stout watched. *Id.* at 19. Plaintiff also asked the deputies if they were scared of contracting HIV since his hand was bleeding. *Id.* at 17-18. Plaintiff testified he told the deputies that he was a member of the Gangster Disciples. *Id.* at 30.

At this point, Sergeant Walton started completing the medical questionnaire part of the booking process. (ECF No. 48-11 at 12). Plaintiff testified that he noticed "someone had blood on them, so when she asked me was I HIV-positive, I told [her] yes." *Id.* He also indicated he had been diagnosed with Hepatitis C. (ECF No. 48-4 at 1). When Sergeant Walton asked him if he had answered the questions truthfully, Plaintiff testified he stated "no, I wasn't HIV-positive; I just said that." (ECF No. 48-11 at 12).

**The Video of What Occurred in the AFIS Room**

Plaintiff is seen entering the AFIS room. He is not wearing a shirt and has a pair of jeans on. Plaintiff walks to a gray backdrop or screen on a cement block wall and stands in front of it. His back is to the screen. One deputy is standing at what appears to be a camera station. Another deputy is sitting at a computer with his back to the Plaintiff. Another deputy is standing at the door with a man who was dressed in street clothes. There is no audio.

Plaintiff then turns to his left side. The deputy at the camera station and the Plaintiff appear to be talking and the deputy is gesturing to the Plaintiff. Plaintiff turns so he again has his back to the screen. After a period of time, Plaintiff turns to his right side. Plaintiff then turns to face the screen. Plaintiff strikes the screen with his right fist. The screen breaks.

The deputy, who is at the camera station, grabs ahold of the Plaintiff's right arm and then pushes him against the wall. The two other uniformed deputies rush to the wall to assist. The man in street clothes also rushes over to assist. Plaintiff is wrestled to the ground (time stamp approximately 2:50) with one deputy pulling him around the face and neck area. There is no view of Corporal Baughman's use of the taser. Plaintiff is placed on the floor face down. One deputy is at Plaintiff's head with one hand on Plaintiff's head holding it to the floor and the other hand appears to be on his back or arm. The two uniformed deputies are each on one side of the Plaintiff. The man in street clothes is to the Plaintiff's right side. A uniformed female enters the room and is standing at Plaintiff's feet. Another two deputies enter the room and assist with holding the Plaintiff on the floor. Several more deputies enter the room but just observe.

Plaintiff remains on the floor for several minutes (from time stamp 2:50 to approximately time stamp 6:15) with deputies holding him down. A woman wearing scrubs, presumably the nurse, enters the room (approximately time stamp 6:00). Plaintiff is handcuffed with his arms behind his back and then raised to a sitting position (at approximately time stamp 6:15). The nurse bends down and appears to be examining the Plaintiff. She then leaves the room. Plaintiff is stood up (time stamp 6:49) and led from the room. There is a round spot on the floor that may be blood. The spot was not there are the beginning of the video.

**The HIV Investigation**

Information regarding the incident was presented to the prosecuting attorney in support of an arrest warrant for terroristic threatening, aggravated assault on a corrections officer, and destruction of vital public property. (ECF No. 48-2 at 5 & 24). Judge Lindsay found probable cause and set bond. (ECF No. 48-2 at 6). An order of protection was issued by Judge Martin covering Brandi Copeland. (ECF No. 48-2 at 7-9).

Detective Hagan began an investigation regarding Plaintiff's HIV status. (ECF No. 48-6 at 1). He discovered that Plaintiff had advised the Granada County Sheriff's Office in Mississippi that he was HIV positive.[1] *Id.* at 2. On August 20, 2015, Plaintiff advised Detective Hagan that he had made up the HIV statement. *Id.* at 3. Plaintiff testified that Detective Hagan told him if he did not consent to the blood draw that "he would have a subpoena done and forcefully draw the blood." (ECF No. 48-11 at 13). Plaintiff consented to a blood draw. *Id.* Southern Health Partners (SHP) drew his blood on August 20, 2015, but it was later learned that the Arkansas Department of Health (AHD) requires their own blood draw. (ECF No. 48-6 at 3). The blood drawn by SHP was discarded. *Id.*

On August 21, 2015, Plaintiff again consented to a blood draw for testing purposes and was transported to the AHD where the blood draw was done. (ECF No. 48-6 at 3). On August 26, 2015, the test results were received by Detective Hagan stating Plaintiff was HIV negative. *Id.* Plaintiff testified that he was not given the results of the blood test until after he filed this case. (ECF No. 48-11 at 13). After receiving the negative test results, Detective Hagan requested that a prosecutor review and, if applicable, obtain an arrest warrant for Plaintiff for communicating a

---

[1] Plaintiff testified he was "pretty sure" that he had not made this statement to Grenada County. (ECF No. 48-11 at 38).

false alarm.  (ECF No.  48-6 at 6).  Plaintiff submitted no requests or grievances about the blood draws or Detective Hagan's conduct.

Plaintiff testified he feels that the actions taken by Detective Hagan invaded his privacy. (ECF No. 48-11 at 40).  Plaintiff stated he "never gave any indication that me and Brandi Copeland had unprotected sex, that we had anything." *Id.*  He also notes that it was not in Detective Hagans's report that Copeland said anything about them having been intimate.  *Id.*  Plaintiff conceded it was possible that she did report they had intimate contact.  *Id.*

**The Interview**

There is a video with audio of the interview.  (ECF No. 48-8, Exhibit A-7).  Plaintiff is seen first sitting in an interview room with his arms and legs shackled.  Detective Hagan enters the room and explains that he will be talking to the Plaintiff about his HIV status because there was some information that Plaintiff reported being HIV positive.  Detective Hagan said he did not know if the information was true or not.

Plaintiff replied he was so drunk when he was being booked in that he was "out of his mind."  Plaintiff stated that the deputies had "caged" him, tased him, used physical force against him, and threw him on the floor.  Plaintiff admitted he did tell the deputies he was HIV positive when he saw the blood on his hands.  However, Plaintiff states he then turned around and told the booking deputy he did not have AIDS and the only medical problem he had was high blood pressure.

Detective Hagan read Plaintiff his rights before he asked Plaintiff any questions.  Plaintiff signed the rights form.

Detective Hagan then went through the intake medical questionnaire with Plaintiff. Despite what his intake medical questionnaire said, Plaintiff stated he had never been diagnosed

with Hepatitis C. Plaintiff also indicated that after the struggle, when they continued asking him questions off the medical questionnaire, he answered that he had HIV. Plaintiff indicated he was still in a restraint chair at this point, was mad, and just kept "throwing stuff" at them—trying to scare them. Plaintiff indicated he had never been diagnosed with HIV or AIDS.

Plaintiff indicated he had gone to the emergency room at the Springdale Hospital approximately two months ago because of his high blood pressure and they drew blood. Plaintiff denied ever having told authorities in Mississippi, where he had been arrested and imprisoned, that he had Hepatitis C or AIDS. Plaintiff indicated he had just gotten out of prison in Mississippi in January. Plaintiff stated that he would consent to having his medical records provided to the Sheriff's Office.

Plaintiff stated he and Copeland had been dating off and on for two months. He stated he never said anything to her about having HIV because it is not true. Plaintiff stated the first people he ever told he had HIV were the deputies in booking. Again, Plaintiff asserted that he tried to tell Sergeant Walton that he did not have HIV. Plaintiff stated that if he had known it would result in an investigation he would have never said it.

Detective Hagan said it might be easier and quicker if Plaintiff consented to having his blood drawn rather than them having to obtain a subpoena for his records through the Mississippi prison system. Detective Hagan called it the "path of least resistance" and a good way for Plaintiff to exonerate himself. Plaintiff stated he would sign a written consent form. Plaintiff asked if he could just make one or two phone calls in order to get someone to pick up his pay check so he could bond out. Detective Hagan replied that he did not have a problem with Plaintiff making some phone calls and would check with them out front. Detective Hagan then left the interview room to get a consent form.

Detective Hagan re-entered the interview room with two nurses and asked Plaintiff to sign the consent form. The form provided that a search of his blood would be conducted for Hepatitis C and/or HIV. Detective Hagan told Plaintiff that he did not have to consent and could say no at any time. Plaintiff voluntarily signed the consent form. Detective Hagan removed Plaintiff's handcuffs so the nurse could draw blood more easily. Plaintiff's blood was drawn. The nurses were told that Detective Hagan would maintain the chain of custody by obtaining the blood from them. Plaintiff asked Detective Hagan to advise him of the results.

**The Slip and Fall**

According to Plaintiff, he was in isolation for two days following the incident in booking and then was moved to lock-down segregation. (ECF No. 48-11 at 41). When he was moved to segregation, Sergeant Freeman ordered that the Plaintiff be handcuffed, waist chained, and shackled each time he was out of his cell--even when Plaintiff was in the shower area. (ECF No. 48-11 at 10 & 42). Plaintiff testified that when he was given his hour out he usually spent about thirty minutes on the phone. *Id.* at 44. Plaintiff stated that he would hold the phone receiver in his hand and then would duck his head down to talk on it. When he was done on the phone, Plaintiff would press a button and tell the deputies that he needed a shower. The deputies would remove the shackles to allow Plaintiff to remove his clothing and then the deputies placed the shackles back on. *Id.* at 44. Plaintiff showered each day. *Id.* The order regarding the shackles lasted about a week. *Id.* at 10.

Plaintiff testified that one day he was in the shower in the waist chains and shackles and slipped and fell. (ECF No. 48-11 at 49). Plaintiff indicated he tried to catch himself and could not resulting in his hitting his head when he fell. *Id.* He also hurt his lower back. *Id.* at 49-50. He was seen by the nurse and given an ice pack for his head overnight and "aspirin or something."

*Id.* at 50.  He continued to receive the medicine for two weeks.  *Id.*  He continued to experience headaches for about two weeks.  *Id.*

Deputy Brannan was asked to assist Deputy Morgan in A-pod K-block and upon entering the block saw Plaintiff lying on his back in the shower area.  (ECF No. 48-5 at 22).  Plaintiff stated he had slipped and fallen.  *Id.*  Nurse Mia began to evaluate Plaintiff and decided to get Plaintiff some medicine from the nurse's station.  *Id.*  Nurse Mia asked Deputies Morgan and Brannan to assist the Plaintiff to a bunk or seat so she could further evaluate him.  *Id.*  Plaintiff was moved to cell K-11.  *Id.*

According to Defendants, Plaintiff was only wearing ankle shackles.  Defendants also maintain that Plaintiff stepped outside the shower area and appeared to be spreading a substance across the floor using his feet.

After his release, Plaintiff testified he went to the emergency room in Springdale.  (ECF No. 48-11 at 51).  He was put on Lortab, a pain medication, for thirty days.  *Id.* at 52.  He did not receive any treatment for his head.  *Id.*  Plaintiff testified that he has ongoing back pain as a result of the incident but while he was out of jail did not get any additional treatment because he could not afford it.  *Id.* at 53.

**The Video of the Slip and Fall**

Plaintiff enters the dayroom from a cell located under the stairwell leading to the second tier (time stamp 7:48).  He is wearing a towel around his waist.  He walks across the day room wearing ankle shackles but his hands are not restrained in anyway.  He initially goes into the shower area but then walks off the screen into the area opposite the shower area.  He returns and enters the shower area again (time stamp 8:43).

The shower area consists of two showers one located on the right of the video screen and one on the left of the screen with an open walkway area between the showers.  Plaintiff enters the shower on the right of the screen.  After beginning to shower, Plaintiff leaves the shower and stands in the walkway between the two showers (time stamp 11:49) and can be seen moving his feet around.  He then returns to the shower on the right and continues his shower.

Plaintiff completes his shower (time stamp 15:13) and begins drying off.  He then steps into the walkway between the showers (time stamp 15:42) and moves into the left shower area to continue drying himself (15:57).  He does not appear to be having any trouble keeping his balance.  As he leaves the left shower area, Plaintiff appears to be heading for the right shower area when his feet slip and he begins falling (time stamp 16:01).  Plaintiff reaches for the half wall that divides the shower area from the dayroom but appears unable to break his fall.  He falls initially onto his buttocks, then to his right side, and then to his back.  Plaintiff remains lying on the floor with his head and upper body in the left shower area, his torso and legs in the walkway, and his feet in the right shower area.  Plaintiff remains lying on the floor until a deputy enters the dayroom several minutes later (time stamp 20:07).

The deputy approaches the Plaintiff and begins talking to him as he is lying on the floor.  A woman dressed in scrubs, presumably a nurse, enters the day room (time stamp 22:31) followed closely by another deputy and another woman dressed in scrubs, also presumably a nurse.  Plaintiff is helped into a sitting position and is examined by one of the nurses.  He then lays back down and the nurse continues to examine him.  A third deputy enters the dayroom and both nurses walk out of the dayroom (time stamp 27:07).  Plaintiff remains lying on the floor in the shower area.  Two deputies then assist Plaintiff to his feet (time stamp 28:30).  Plaintiff, who is leaning over at the waist and walking slowly, is assisted back to his cell.  A mat is brought in and taken into Plaintiff's

cell.  The Plaintiff's cell is under the stairs and from the angle of the video camera only glimpses can be seen of what occurred inside the cell.  The deputies then leave Plaintiff's cell (time stamp 32:03) and close the cell door.   The deputies leave the dayroom.

After a short period of time, the two female nurses accompanied by a male nurse and two deputies re-enter the dayroom (time stamp 36:34).  All five enter the Plaintiff's cell.  Again, only glimpses of movement can be seen.  All five leave the Plaintiff's cell (time stamp 37:27) and exit the dayroom.  The remainder of the video simply shows an empty dayroom and shower area.

**The Submission of Grievances**

During Plaintiff's incarceration, detainees had access to an electronic kiosk for purposes of, among other things, submitting requests or grievances.  (ECF No. 48-1 at 4).  Plaintiff submitted a number of requests beginning on August 22, 2015.  (ECF No. 48-3 at 1-2).  None addressed any of the incidents at issue in this case.  *Id.*  Plaintiff testified he was familiar with the kiosk system.  (ECF No. 48-11 at 45).  He could not recall complaining about his housing or the waist chains.  (ECF No. 48-11 at 45).  He testified that he did verbally complain to deputies about the waist chains.  *Id.*  Even when he was in shackles, Plaintiff testified he could use the kiosk system.  *Id.* at 53.

Plaintiff posted bonds on all charges and was released on September 1, 2015.  (ECF No. 48-2 at 24).  Following his release, one deputy reported that his wife had received a Facebook friend request from Plaintiff.  (ECF No. 48-6 at 5).  Another deputy and one clerk reported receiving Facebook friend requests from the Plaintiff.  *Id.*

Plaintiff was incarcerated in the WCDC again in January, March, August, and September of 2016.  (ECF No. 48-11 at 7-8).  On September 28, 2016, Plaintiff submitted an inmate request that stated he needed a § 1983 form to file a lawsuit against the WCDC about the use of excessive

force against him, being subjected to cruel and unusual punishment when made to go to the shower in waist chains and shackles, for discrimination, and for harassment. (ECF No. 48-3 at 3). He stated he had been threatened "inside" by detectives, picked up several times on bogus charges, and should be out of jail but the court would not appoint him a public defender. *Id.* Plaintiff stated he felt it all stemmed from an incident he had last year with someone who had been working there about twelve years. *Id.*

Plaintiff submitted a second grievance that same day about what occurred during his booking. (ECF No. 48-3 at 3). He stated he had been attacked and tased by several deputies even after he was restrained and lying face down. *Id.* He indicated that he continued to be tased even after a deputy had a knee on his head. *Id.* Plaintiff was then placed in segregation. *Id.*

While in segregation, Plaintiff stated that he was made to shower, "waist chained, and shackled." (ECF No. 48-3 at 3). He believed this was Washington County's way of "showing me they still think of me as a slave." *Id.* He indicated being chained caused him to fall, hitting his head, and injuring his back on two occasions. *Id.* Before he bonded out, Plaintiff stated he was taken into a room and detectives threatened his life. *Id.* After he bonded out, Plaintiff indicated he was constantly harassed by all law enforcement agencies in Washington County. *Id.* He stated he had been in fear of his life. *Id.*

Corporal Mulvaney responded to the grievance noting that Plaintiff's own actions "somewhat dictated" the reaction of detention center staff. (ECF No. 48-3 at 4). Corporal Mulvaney indicated Plaintiff had been aggressive and failed to comply with orders resulting in Corporal Baughman tasing the Plaintiff. *Id.* Corporal Mulvaney noted that Plaintiff's continued resistance resulted in more drive stuns being applied. *Id.* It was noted that Plaintiff had been seen by the nurse and no injuries were observed. *Id.*

Corporal Mulvaney further noted he had a video clip showing the fall that occurred on August 23, 2016, in the shower area. (ECF No. 48-3 at 4). On that day, Corporal Mulvaney stated the Plaintiff was not wearing any type of restraints. *Id.* During that incarceration, Corporal Mulvaney noted they "may have been mandated by a supervisor . . . to have [Plaintiff] placed in belly chains any time [he was] out of [his] cell due to the threats [he] had made and [his] actions." *Id.*

Corporal Mulvaney noted that Plaintiff had never submitted a grievance referring to any of the above incidents until a year later despite the fact that he had been incarcerated four other times at the WCDC. (ECF No. 48-3 at 4). Finally, Corporal Mulvaney noted the first incident in the booking area had been reviewed by supervisors and nothing was found to be excessive. *Id.*

Plaintiff responded by noting he had not filed a grievance because he was about to let the issue drop. However, after "witnessing the racists acts" that went on at the WCDC during his current incarceration, Plaintiff states he decided to start the process and knew he had to exhaust the grievance process first. Plaintiff then asked that the grievance be closed because he had already started the "process."

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that

a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    DISCUSSION

Defendants move for summary judgment on the following grounds:  (1) Plaintiff failed to exhaust his administrative remedies; (2) the use of force against the Plaintiff on August 18, 2016, was reasonable in light of the circumstances; (3) Sergeant Walton was not deliberately indifferent to Plaintiff's constitutional rights; (4) restrictions on the Plaintiff's movement were based on legitimate penological goals and did not cause the Plaintiff to slip and fall; (5) there was no denial of due process in connection with testing the Plaintiff for HIV; and (6) Defendants are entitled to qualified immunity.

### (A).  Section 1983 in General

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that the defendant

acted under color of state law and that he violated a right secured by the Constitution. *West v. Atkins*, 487 U.S. 42 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir. 1999). The deprivation must be intentional, as mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

### (B). Exhaustion of Administrative Remedies

The Prison Litigation Reform Act (PLRA) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal quotation marks and citation omitted), the Supreme Court concluded "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *See also Woodford v. Ngo*, 548 U.S. 831, 90 (2006) ("[P]roper exhaustion of administrative remedies … means using all steps that the agency holds out, and doing so *properly*"). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 599 U.S. at 218. A prisoner's remedies are exhausted "when [the] inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits." *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012).

The WCDC grievance procedure provides that grievances should be submitted via the kiosk located in the cell block. (ECF No. 48-10 at 3). Grievances are to be "made promptly after

the incident has occurred." *Id.* The grievance is to "state fully the time, date, and names of the detention deputies and/or staff members involved and pertinent details of the incident, including the names of any witnesses." *Id.* The WCDC Handbook provides that "[a] grievance must be submitted within eight hours from the time the event complained of occurred." *Id.* at 24.

With respect to the incident in booking, Plaintiff states he should be excused from complying with the grievance procedure because Defendants admitted he was not in his right state of mind while being booked. Further, Plaintiff states he did not have access to the kiosk during the two days he was in isolation. He argues there was no way he could comply with the eight hour time frame.

The Eighth Circuit Court of Appeals has recognized two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures; or, (2) when the officials themselves fail to comply with the grievance procedures. *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (explaining a prisoner is only required to exhaust those administrative remedies that are "available" and any remedies that prison officials prevent a prisoner from utilizing are not considered available).

In this instance, there is at least a question of fact as to whether or not the Plaintiff had the ability to submit a grievance within eight hours of the incident in the AFIS room as required by the grievance procedure. Moreover, when Plaintiff did submit a grievance, on September 28, 2016, Corporal Mulvaney addressed the merits of the grievance even though he recognized the grievance had been untimely filed. Plaintiff therefore is deemed to have exhausted the grievance procedure as to this claim. *See e.g., Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012)(PLRA's exhaustion requirement is satisfied if prison officials decide a procedurally flawed grievance on the merits).

With respect to his slip and fall, Plaintiff states he should also be excused from complying with the grievance procedure because of his mental state; and he was escorted back to his cell and was not be allowed out of the cell until the following day for recreation—more than eight hours after the event. While Plaintiff may have been unable to submit a grievance during the eight hour window, Plaintiff never submitted a grievance at all addressing this issue. He made no attempt to exhaust the grievance procedure. This claim is subject to dismissal for failure to exhaust. *Hammett*, 681 F.3d at 948 (dismissal without prejudice of only unexhausted claims proper).

With respect to Detective Hagan, Plaintiff asserts that Detective Hagan advised him that he had nothing to do with what went on in the detention center. Plaintiff further asserts that the grievance procedures do not extend to possible criminal charges being filed against him. The grievance procedure provides that it is "restricted to incidents that occur while the detainee is in the custody of the facility." (ECF No. 48-10 at 3). It applies "whenever the detainee believes they have been subjected to abuse, harassment, an abridgement of civil rights, or a denial of privileges specified in the Detainee Handbook." *Id.* Plaintiff contends Detective Hagan invaded his privacy during an interview conducted at the detention facility. This appears to be the type of claim that can be brought under the grievance procedure. Plaintiff made no attempt to comply with the grievance procedure. This claim is also subject to dismissal for failure to exhaust.

**(B). Excessive Use of Force**

Plaintiff, citing Taser International users product warnings, states that the risk of serious injury or death increases with multiple and simultaneous applications especially when the subject has certain risk factors such as struggling, being overweight, or using drugs or alcohol. With respect to his lack of need for medical treatment, the Plaintiff notes it is the quantum of force applied that is of importance. Further, he argues the use of force was not necessary under the

circumstances as he made no aggressive moves towards detention center personnel. Instead, he maintains he was being punished for hitting the wall and cracking the plastic photographic backdrop. He notes he was surrounded by multiple guards, more guards were just outside the door, and no bystanders were present. He states while on the floor he was not attempting to snatch his hands away, to get up, or fight, or buck the deputies off him.

The law is clear that a pretrial detainee cannot be punished. *See e.g. Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "However, not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).

The Supreme Court held that a pretrial detainee need only show that a deputy's use of force was objectively unreasonable to prevail on an excessive force claim. *Kingsley v. Hendrickson, et al*, ___ U.S. ____, 135 S. Ct. 2466, 2473 (2015). The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Id.* (*quoting Graham v. Connor*, 490 U.S. 386, 396 (1989)). The determination should be made:

> from the perspective of a reasonable officer on the scene. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

*Id.* (*quoting Bell*, 441 U.S. at 540). In determining whether a given use of force was reasonable or excessive, the Court said the following may bear on the issue:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id*. The Court noted that the list was not exclusive but instead only illustrated the "types of objective circumstances potentially relevant to a determination of excessive force." *Id*.

With respect to the use of tasers, the Eighth Circuit has found that "prisoners have a clearly established right to be free from a Taser shock or its equivalent in the absence of a security threat." *Brown v. City of Golden Valley*, 574 F.3d 491, 500 (8th Cir. 2009)(Eighth Amendment case); *see also Walton v. Dawson*, 752 F.3d 1109, 1116-17 (8th Cir. 2014)("the Fourteenth Amendment gives state pretrial detainees . . . rights which are at least as great as the Eighth Amendment protections available to a convicted prisoner")(quotation marks and citation omitted). The Eighth Circuit noted that a review of the case law "revealed that the use of force was justified when there was a concern for the safety of the institution, the jailers, and the inmates." *Id.* (citation omitted). It was further noted that "a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless." *Id.* (quotation marks and citation omitted).

While Plaintiff admits he suffered no injury other than the pain at the time and an injury to his skin from the taser probes, the Supreme Court has made clear that the focus in an excessive force claim is on the quantum of force used and not the injury sustained. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010); *Hudson v. McMilliam*, 503 U.S. 1, 4 (1992)("the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury"). The extent of injury, however, "provides some indication of the amount of force applied" and is a "factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation." *Wilkins*, 559 U.S. at 37 (quotation marks and citations omitted).

While a video normally provides the best evidence of an altercation, in this case there are so many deputies surrounding the Plaintiff that it is impossible to tell when the stun gun was deployed or what behavior the Plaintiff was exhibiting at the time. This leaves the Court with two

different versions of what occurred. Plaintiff states he punched the wall because he was angry and frustrated and took no further aggressive actions and did not resist the deputies other than questioning why they were using force against him. Defendants' version of the events is the polar opposite. They maintain the Plaintiff was resisting and not complying with orders necessitating the use of force against him including the use of the stun gun four times.

As the case law discussed above demonstrates, the law was clearly established that the use of physical force and the use of a taser multiple times, is not justified unless the detainee is resisting and can be considered a security risk. *See e.g., Smith v. Conway County, AR,* 759 F.3d 853, 861 (8th Cir. 2014)(with respect to a second Taser strike, the Court stated it is clearly established that a non-violent detainee has a "constitutional right to be free from being tased for non-compliance"); *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014)(clearly established that the use of force against a pretrial detainee who was not resisting or being aggressive was unconstitutional under the Fourteenth and Eighth Amendments). Here, there are opposing stories as to whether Plaintiff was resisting or not. It cannot be determined from the video if he is offering any resistance to the officers. Viewing the evidence in the light most favorable to the Plaintiff, as the Court must, there is a genuine issue of fact as to whether the Defendants used excessive force against the Plaintiff. Defendants are therefore not entitled to qualified immunity. *Jones v. McNeese*, 746 F.3d 887, 894 (8th Cir. 2014)(An individual is "denied qualified immunity if the answers to the following two questions are yes: (1) whether the plaintiff has shown the violation of a statutory or constitutional right, and (2) whether that right was clearly establish at the time of the alleged misconduct")(quotation marks and citation omitted).

### (C).  Failure to Intervene

Plaintiff maintains that Sergeant Walton violated his constitutional rights when she failed to intervene when excessive force was being used against him.  It has been held that even if an officer did not participate in the use of unnecessary or excessive force, "he was nonetheless under a duty to prevent the use of such force, even if the officers beating [the detainee] were his superiors" if the constitutional violation took place in his presence.  *Webb v. Hiykel*, 713 F.2d 405, 408 (8th Cir. 1983); *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981).  The officer accused of failing to take reasonable steps to protect the victim must have had a realistic opportunity to prevent the attack.  *Hadley v. Gutierrez*, 526 F.3d 1324, 1330-1331 (11th Cir. 2008)(citations omitted); s*ee also Putman*, 639 F.2d at 424 (liability if the non-intervening officer saw the beating or had time to reach the offending officer).

In this case, the video shows that Sergeant Walton did not enter the room until Plaintiff had been wrestled to the floor and was being held down by the officers.  She was not present when the use of force began and did not see what behavior the deputies were reacting to.  Quite simply, it is obvious from the video that she had no idea what caused the struggle or whether the officers were using excessive force.  There is no genuine issue of material fact as to whether she failed to intervene when she had a duty to do so.  Sergeant Walton is entitled to summary judgment on this claim.

Having found that the facts do not make out a constitutional violation, Sergeant Walton is entitled to qualified immunity.  *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**(D). Use of Restraints while Showering**

Plaintiff asserts that the video clearly shows that while his right hand was free on this occasion, his left hand was held close to his body at all times because he was waist chained and shackled. He also points out that the only people he had contact with during this time period were the deputies who removed and replaced the shackles. He contends the restraints were useless as a security measure because had he wanted to attack the deputies, he could have done so when the shackles were removed and he was undressing.

In connection with the use of restraints, the Eighth Circuit has, in cases involving the use of handcuffs, found the use of the restraints for their intended purpose, without additional factors, does not amount to excessive force unless some long-term or permanent injury resulted. For example, in *Crumley v. City of St. Paul*, 324 F.3d 1003, 1008 (8th Cir. 2003), the court concluded no reasonable jury could have found excessive force in applying handcuffs because the plaintiff failed to present any medical records indicating a long-term or permanent physical injury.

Here, the video clearly shows that Plaintiff's hands were not restrained in anyway and he was not wearing any type of shackles around his waist. Plaintiff was able to shower and move without difficulty. The leg restraints were used for their intended purpose and Plaintiff suffered no injury as a result of their use. Defendants are entitled to summary judgment on this claim.

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**(E).  HIV Investigation**

Although the Court has found Plaintiff did not exhaust his administrative remedies with regard to this claim, the Court will nevertheless address the merits of the claim for the purpose of providing a full record for review.  Plaintiff admits he stated that he had Hepatitis C and was HIV positive.  He made the statements because he was angry the deputies had used force against him and placed him in a restraint chair.  Plaintiff further admits he consented to both the blood draw at the WCDC and the AHD.  However, he states his consent was based on Detective Hagan's representation that he could obtain a subpoena to have the Plaintiff's blood drawn by force.  In fact, Plaintiff states Detective Hagan had already obtained a warrant for his blood.  According to Plaintiff, "[t]he notion that it is constitutional to go through such measures to investigate a crime without first knowing if a crime has been committed is ridiculous."

The audio and video of Detective Hagan's interview with the Plaintiff clearly shows that Plaintiff voluntarily consented to have his blood drawn for the purpose of being tested for Hepatitis C and HIV and was under no duress at the time.  Detective Hagan at no time mentions Plaintiff's blood being taken by force.  Plaintiff also volunteered to consent to Defendants obtaining his medical records from the prison in Mississippi and from the Springdale Hospital.  There was no invasion of privacy and no duress.  Detective Hagan is entitled to summary judgment on this claim.

Having found that the facts do not make out a constitutional violation, Detective Hagan is entitled to qualified immunity.  *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**(F).  Slip and Fall**

Similarly, while the Court has held that Plaintiff failed to exhaust his administrative remedies on this claim, the Court will nevertheless address the merits of the claim to provide a full record for review.  As noted above, Plaintiff was a pretrial detainee.  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(internal quotation marks and citation omitted). In *Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006), the Eighth Circuit held that deliberate indifference is the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety."

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element.  *Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities.  The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted).  Deliberate indifference is established when the plaintiff

shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Here, Plaintiff slipped and fell in the shower area while wearing leg shackles. Obviously showers are slippery both as a result of the presence of water but also the presence of the residue of soap and other products used in bathing. "[S]lippery floors constitute a daily risk faced by members of the public at large." *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004). The Court noted that in general slippery prison floors do not make out an Eighth Amendment claim. *Id.* In *Reynolds*, the Tenth Circuit was faced with the question of whether or not the fact that the prisoner was on crutches "presents sufficiently special or unique circumstances that require us to depart from the general rule barring Eighth Amendment liability in prison slip and fall cases." *Id.* at 1032. The Court held it did not noting the Plaintiff had been aware of the problem for some seven weeks and had safely entered and exited the shower area on crutches on numerous occasions prior to the fall. *Id.* It concluded that "the hazard encountered by plaintiff was no greater than the daily hazards faced by any member of the general public who is on crutches, and that there is nothing special or unique about plaintiff's situation that will permit him to constitutionalize what is otherwise only a state law claim." *Id.*

This case is of course different to the extent that members of the general public do not wear leg shackles. However, it has been held that "shackling a dangerous inmate in a shower [does not] create[] a sufficiently unsafe condition." *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993). Under the facts of this case, there has been no showing that the slip and fall was due to the restraints

as opposed to the floor merely being slippery.  No claim of constitutional dimension has been stated.  Defendants are entitled to summary judgment on this claim.

Having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity.  *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

## IV.    CONCLUSION

For the reasons stated, the Motion for Summary Judgment (ECF No. 45) is **GRANTED IN PART AND DENIED IN PART.**  Specifically, the Motion (ECF No. 45) is **GRANTED** with respect to the following claims: Plaintiff's claim against Sergeant Walton based on her alleged failure to intervene on his behalf; his claim that the use of restraints was unconstitutional; his claims that Detective Hagan violated his Due Process rights and/or invaded his privacy when Plaintiff's blood was taken to be tested for Hepatitis C and HIV; and his claims regarding his slip and fall.  This ruling dismisses the claims against Defendants Sergeant Walton, Detective Brett Hagan, and Sergeant Freeman.

The Motion (ECF No. 45) is **DENIED** with respect to the excessive force claim asserted against Deputies Stout and Corporal Baughman.  A trial will be scheduled.

IT IS SO ORDERED on this 23rd day of April 2018.

*/s/ P. K. Holmes III*
P. K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE